## Case No. 14,833.

### UNITED STATES v. COLLIER.

[3 Blatchf. 325.] 1

Circuit Court, S. D. New York. Oct. 2 and Nov. 30, 1855.

SPECIAL VERDICT—COLLECTOR OF CUSTOMS—CONSTRUCTION OF STATUTE—PROCEEDS FROM SALE OF SEIZED PROPERTY—LIABILITY FOR STOLEN MONEY—RECEIVERS OF PUBLIC MONEY.

1. A special verdict, which seemed to be incongruous in finding that, in any event, a defendant was entitled to certain items of allowance, and yet declaring that such allowances depended upon questions of law to be submitted to the decision of the court, construed as not restricting the authority of the court to pass upon the whole subject matter, including those items.

2. The act of March 3, 1849, "To extend the revenue laws of the United States over the territory and waters of Upper California and to create a collection district therein" (9 Stat. 400), construed, in reference to the compensation of the collector of the district of Upper California, appointed under it.

3. In the construction of a statute, the court will look out of it to other statutes in pari materia, or of a similar purport, especially in respect to revenue laws, which, although made up of independent enactments, are regarded as one system, in which the construction of any separate act may be aided by the examination of other provisions which compose the system.
[Cited in The Viola, 59 Fed. 635.]
[Cited in Ketcham v. Hill, 42 Ind. 72.]

4. The facts and circumstances which led to and surrounded the passage of the said act of March 3, 1849, as derived from the journals of the two houses of congress, the documents laid

---

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

before congress, and the debates in congress, considered, in construing the said act.

5. Contemporaneous, antecedent, and subsequent enactments on the same subject matter, considered, in construing the said act.

6. Where the United States, in adjusting the accounts of a collector appointed under the said act, treated him as having acted as collector under said act until the 14th of January, 1851, and adopted his acts until that time as being official, *held*, in an action against him to recover an alleged balance in his hands as such collector, that the United States were estopped from claiming that he was not entitled, during the whole time he so acted as such collector, to the compensation provided by said act of 1849, notwithstanding the passage of the act of September 28, 1850 (9 Stat. 508).

7. Such collector was entitled, during the whole time he so acted as such collector, to a salary of $1,500 per annum, and also to the fees and commissions prescribed by the thirty-fourth section of the act of February 18, 1793 (1 Stat. 316), and by the second section of the act of March 2, 1799 (Id. 706), notwithstanding the passage of the said act of September 28, 1850.

8. Where such collector seized, as forfeited to the United States, certain liquors, as being imported contrary to law, and, without procuring any condemnation of them by legal process in Louisiana or Oregon, under section 5 of said act of March 3, 1849, because such proceeding was impracticable, sold them, with the assent of their owners, and received the proceeds, and the United States, with notice of such want of condemnation, received, to the use of the United States, the one-half of the proceeds of such sales, and entered the usual credits, in such collector's accounts, for such amounts, *held*, that such collector was entitled, under section 91 of the act of March 2, 1799 (1 Stat. 697), to retain to his own use the one moiety of such proceeds.

9. Such collector was entitled to such moiety, although the secretary of the treasury had, on the application of the owners of such liquors, made allowances to them as and for the cost and value of such liquors before their importation.

10. Where such collector took bonds to the United States, on the delivery up of seized vessels and goods, and, on leaving office, returned them into the treasury department, and they had not been collected, nor had any proceedings been taken by that department to collect them, and it appeared that, if they had been collected, such collector would have been entitled to the one-half of their amount, *held*, in such action against such collector, that he was not entitled to a credit for such one-half.

11. A collector's right to a share in seized property applies only to the proceeds obtained from its condemnation and sale, and does not attach to the property itself.

12. The additional duties of 20 per cent. ad valorem, imposed for undervaluation by section 8 of the act of July 30, 1846 (9 Stat. 43), are not fines or penalties. *Held*, therefore, that such collector was not entitled to a moiety of them.

13. Such collector was not chargeable with a sum of money stolen from the deputy collector at Monterey, appointed under the said act of March 3, 1849, such sum having been stolen without neglect or default on the part of such collector, and having been disallowed to him as a credit at the treasury department.

14. The legal relation between public officers and their sworn assistants, even when they are acting directly in connection, is generally not that of master and servant, or principal and agent; and the liability of the official superior for defaults of his assistants arises only in case of his own misconduct or neglect.

15. In an action by the United States against a disbursing officer or agent, or other individual, for the recovery of moneys claimed of him, the defendant is entitled, on the trial, to the allowance of all equitable demands of his against the United States, if the same have been submitted to the proper accounting officers of the government and disallowed by them.

16. A balance equal to the amount of the money so stolen from such deputy collector at Monterey, having, as the result of the principles so settled in this case, been found to be due to such collector from the United States, the court ordered such balance to be certified, without allowing interest to either party.

17. The treasury department acts in a judicial capacity, in determining the charges to which a collector is subject, and cannot vary that adjudication subsequently, to his prejudice.

18. Where the treasury department made up five statements of the account of such collector, three before suit brought, and two afterwards, and did not claim interest against the defendant in any of them except the last, which was made up after such collector had paid to the government, in settlement, an amount which the court found overpaid the government, and the balance stated in each of such accounts was more than was due from such collector, and the action was brought upon the first account that was made up, and it appeared that the account was, in effect, open and running until the fourth account was made up, and that that account was grossly erroneous, *held*, that the United States were not entitled, in such suit, to charge the defendant in account with interest on the balance in his hands when such suit was brought.

19. The first section of the act of March 3, 1797 (1 Stat. 512), subjecting a receiver of public money to the payment of interest thereon, if he neglects or refuses to pay into the treasury the balance reported to be due to the United States upon the adjustment of his accounts, does not apply to the case of such collector.

This was an action commenced on the 10th of May, 1852, to recover from the defendant [James Collier] a balance alleged to be due from him to the United States on his official bond as collector for the district of Upper California. He acted as such collector from the 3d of April, 1849, until the 14th of January, 1851. The defendant filed a plea of the general issue, and a notice that he claimed against the plaintiffs various specified credits, which exceeded their demand, and had been presented by him to the accounting officers of the treasury and disallowed; and he claimed that he was entitled to have a balance certified in his favor upon the whole accounting. At the trial, before Betts, J., in April, 1854, the jury found a special verdict, and the case now came before the court on a case made, which contained the evidence given on the trial, and the special verdict, and various exceptions taken on the trial to rulings of the court.

Charles O'Conor, for the United States.

Daniel S. Dickinson and John A. Collier, for defendant.

Before NELSON, Circuit Justice, and BETTS, District Judge.

BETTS, District Judge. We do not consider it necessary to go out of or beyond the facts found by the special verdict and the

documents adopted by it, in stating the reasons for our judgment in this case.

The jury find, that the treasury department made up and stated the account of the defendant five several times, to wit: on the 7th of June, 1851, in which they claimed a balance of $791,065.31; on the 24th of September, 1851, in which they claimed a balance of $789,925.35; on the 26th of December, 1851, in which they claimed a balance of $750,933.80; on the 7th of March, 1853, in which the commissioner of customs made up the balance at $216,712.43, and the auditor stated it at $181,797.00; and fifthly, on the 22d of September, 1853, in which a balance was claimed against the defendant of $241,329.47. Each of those five several balances, as thus stated, the defendant, by letter from the treasury department accompanying the statement of account, was required to pay to or deposit with an assistant treasurer of the United States. The account of September 22, 1853, contained no credit for the sum of $118,546.05, paid on the 16th of September, 1853.

This disaccord in the treasury statements of the defendant's account does not result from the admission or rejection of items on the exhibition of new evidence, but is owing chiefly to changes in the principle upon which charges and credits are inserted or withdrawn or modified, on the various reconsiderations of those statements. We shall, therefore, limit our observations to the particulars charged by the plaintiffs and objected to by the defendant, or submitted and claimed by him and disallowed at the treasury department, without undertaking to readjust the account and determine the result. That will be more conveniently and accurately done at the department, when it is possessed of our decision.

The disputed particulars consist substantially of five items, four of which take the form of claims of credit on the part of the defendant, the other being a direct debit charged against him by the plaintiffs. Still, the largest item, and that which has been the main subject of contestation between the parties, is of a compound character. It relates to the compensation the defendant is entitled to receive, and is brought forward in a double aspect, partly by the plaintiffs, in the way of charges against the defendant for official fees and commissions received and retained by him exceeding a certain maximum, and directly by the defendant, as an entire credit to which he is entitled.

The finding of the jury embracing the particulars of compensation is, that the statement made up at the treasury department on the 7th of March, 1853, gave no credit to the defendant for his compensation, except the sum of $1,745.56 for salary, and no credit for any of his claims for commissions; that he officiated as collector of the district of Upper California, from the 3d of April, 1849, to the 14th of January, 1851, and, during that

period, collected and received, for duties on imports and tonnage, $2,108,365; that, of that sum, he received, after the passage of the joint resolution of congress of February 14, 1850 (9 Stat. 560), and before the passage of the act of September 28, 1850 (Id. 508), $1,027,719.33, and, after the passage of the last-mentioned act, $625,656.27; that the defendant was credited in the account of September 22, 1853, with the sum of $30,831.58, as a commission of three per cent. on the sum received between the passage of the said joint resolution and of the said act, and also with the sum of $2,524.83, for his salary, at the rate of $10,000 per annum, after September 28, 1850, and, on account of his compensation prior to February 14, 1850, with the sum of $1,300; that neither of those sums had been previously credited; and that, in any event, he is entitled to those allowances, in the account to be stated pursuant to the verdict. The jury further find that, previous to the passage of the said joint resolution, the defendant received, as emoluments of his office (exclusive of the commissions aforesaid), the following sums, to wit: between the date of his entering upon said office and the passage of said joint resolution, the sum of $4,500; between the passage of said joint resolution and the passage of the said act of September 28, 1850, the sum of $11,250; and, after the passage of the last-mentioned act, the sum of $5,250. And the United States claim, that the defendant is bound to account for and pay over to the United States all the excess of the emoluments received by him beyond an amount sufficient to make his maximum compensation $3,000 per annum, except during the period between the passage of the said joint resolution and of the said act. The special verdict also declares, that inasmuch as the allowances or disallowances of the items in dispute between the parties depend upon questions of law which are proper to be submitted to and decided by the court, it is agreed that the verdict and finding of the jury shall be entered in the case after the decision of the court, and conformably to such decision. The defendant, on his part, claims that he should be credited, on his compensation account, with a fixed salary, at the rate of $1,500 per annum, during the whole period he served in the office, and with all the fees and commissions allowed by law which were collected by him. The seeming incongruity in the special verdict, in finding that, in any event, the defendant is entitled to certain specified particulars of allowances, and yet declaring that the allowances and disallowances in controversy in the account depend upon questions of law which are submitted to the decision of the court, is not, in our judgment, to be so construed as to restrict the authority of the court, or place any impediment in its way, in passing upon the whole subject matter, including those specified items.

The solution of the point in question de-

pends upon the true meaning and effect of the act of congress of March 3, 1849. entitled, "An act to extend the revenue laws of the United States over the territory and waters of Upper California. and to create a collection district therein" (9 Stat. 400).

The treasury department, in stating the defendant's account, have considered his compensation to be subject to the limitations of the tenth section of the act of May 7, 1822 (3 Stat. 695), by which it is provided, that whenever the emoluments of any collector of the customs (other than those particularly excepted) shall exceed $3,000, after deducting therefrom the necessary expenses incident to his office in the same year, the excess shall be paid into the treasury, for the use of the United States. The defendant claims that the compensation allowed to him by the act of March 3, 1849, is independent of all previous limitation, and is to be determined conformably to the meaning and effect of that act.

It is enacted by that law (section 1) that the revenue laws of the United States be, and they are hereby extended to and over the main land and waters of all that portion of territory ceded to the United States, heretofore designated and known as Upper California; that (section 2) all the ports, harbors. bays, rivers and waters of the main land of the territory of Upper California. shall constitute a collection district, by the name of Upper California, and a port of entry shall be and is hereby established for said district, at San Francisco, on the bay of San Francisco, and a collector of customs shall be appointed by the president of the United States, by and with the advice and consent of the senate, to reside at said port of entry; that (section 3) ports of delivery shall be established in the collection district aforesaid, at San Diego, Monterey, &c.. and the collector of the said district of California is hereby authorized to appoint. with the approbation of the secretary of the treasury, three deputy collectors, to be stationed at the ports of delivery aforesaid; and that (section 4) the collector of said district shall be allowed a compensation of $1,500 per annum, and the fees and commissions allowed by law, and the said deputy collectors shall each be allowed a compensation of $1,000 per annum, and the fees and commissions allowed by law.

If the defendant's compensation is subject to limitation by any antecedent statute, we perceive no legal reason why the act of May 7, 1822, should be applied to the case, and the posterior act of March 3, 1841 (5 Stat. 432), should be disregarded. The fifth section of the latter act provides. that no collector of customs "shall, on any pretence whatsoever. hereafter receive, hold or retain for himself, in the aggregate, more than $6,000 per year, including all commissions for duties, and all fees for storage. or fees, or emoluments, or any other commissions, or

salaries, which are now allowed and limited by law." It is manifest, that collectors whose compensation had been restricted by the prior statute to $3,000 a year, would, after the passage of the act of March 3, 1841, be relieved from that limitation, and be entitled to retain from their receipts a compensation of $6,000 annually; and the defendant can be placed in a no more disadvantageous position, by a constructive limitation implied under the act of March 3, 1849, than was incident to the office by the positive provisions of law in force when that act went into operation. In our opinion, therefore, if the defendant is restrained to a specified amount of compensation, under the laws in force when the act of 1849 was enacted, it would be to the latter and larger sum. and not to that first appointed, the act of 1841 being the latest expression of the legislative will on the subject. The condition in which the defendant is placed in this respect, depends, therefore, upon the purport and scope of the act of 1849; and we shall proceed to state concisely our views of its true construction and effect.

Generally, a statutory enactment controls all prior usages and laws, and establishes the rule which governs the subject matter; and its language is to be understood according to its natural and ordinary import. 1 Kent, Comm. (7th Ed.) 462, 463. The intention which forms the governing principle of the law is to be extracted from the entire enactment (Strode v. Stafford Justices [Case No. 13,537]); and. to ascertain the legislative will, courts not only search all the provisions of the particular statute, but may look out of that to others in pari materia, or of a similar purport, especially in respect to revenue laws, which. although made up of independent enactments, are regarded as one system (Wood v. U. S., 16 Pet. [41 U. S.] 342, 363). in which the construction of any separate act may be aided by the examination of other parts and provisions which compose the system. This doctrine is in furtherance of the general principle, that the statute itself must furnish, primarily and essentially, the indications of the will of the legislature; and, should the provisions in respect to the compensation of the collector be found to be obscure, the interpretation most favorable to him should be adopted. U. S. v. Morse [Case No. 15,820].

The act of March 3, 1849. creates new offices within a territory first brought by that statute under the revenue laws of the United States. The whole body of those laws is extended to and over the main land and waters of Upper California. We do not consider it necessary, in the examination of this case, to go into the inquiry, whether the transfer of the revenue laws embraced also the entire legislation of congress in relation to agencies and means employed or authorized for the purpose of collecting revenue from imports. and especially in relation to

incidental advantages and benefits allowed to revenue officers; for, in respect to the point in hand, the 4th section of the act of 1849 recognizes, as a part of the laws so extended, those which relate to fees and commissions to collectors.

The provisions appointing fees to collectors for their services under the revenue laws, are contained in the thirty-fourth section of the act of February 18, 1793 (1 Stat. 316), and in the second section of the act of March 2, 1799 (Id. 706). The particulars and amounts of the fees and commissions claimed to be payable under those laws, are not in dispute in this action, nor is it disputed that the defendant has retained the proper sum. and is entitled to credit therefor, provided the act of 1849 bestows them upon him without limitation. The question of restriction or qualification is the one in controversy between the parties. In that view, the fourth section of the act of 1849 is to be read as if the fees and commissions enumerated by the acts of 1793 and 1799 had been repeated in terms in that section; and the grant of compensation would then be direct and positive, both of the fixed sum of $1,500 per annum and of those specific fees and commissions. The general reference is equivalent to and of the same effect as the reiteration of the particulars, that being certain in law which may be reduced to a certainty; and, the tariff of fees and commissions being fixed. the collection of them would render this branch of compensation equally determinate with the other.

It is not denied that the act of 1849 means, that the defendant shall take, as his own property, the fees and commissions allowed by law. It is not directed that they shall be applied in satisfaction of his salary. The act guarantees the salary, with the possible implication that, if it is not obtained from other means in his hands, it will be paid him by the treasury. The question raised is, whether such direct devotement of fees and commissions is charged with the condition applied to antecedent grants of compensation to collectors, that salary and perquisites conjointly shall not exceed $6,000 per year. That limitation is supposed to be imparted by extending the revenue laws to California. We do not enter into that discussion; for, if such restriction might be implied, in the absence of any expression of the intent of congress, we think that the language of the fourth section of the act, establishing the compensation, indicates plainly that no limitation was meant to be applied in this case.

The act creates Upper California a collection district, and establishes a port of entry at San Francisco. It also establishes three other ports of delivery, and authorizes the appointment of a deputy collector to be stationed at each. It then declares, that the collector of said district shall be allowed a compensation of $1,500 per annum and the fees and commissions allowed by law, and that the said deputy collectors shall each be allowed a compensation of $1,000 per annum and the fees and commissions allowed by law. The same language is used in each of these paragraphs, and they are reasonably to be supposed to have been employed in a common sense. There is certainly no ground for an inference that congress designed to make a provision for the deputy collectors more advantageous to them than that applicable to the collector. The grant to them is not only affirmative and positive, but was an original one—that class of officers not being entitled, under the then existing revenue laws, to fees or commissions, or coming within the restrictive clauses of the acts of 1822 and 1841. The enactment must, accordingly, be understood as conferring on them absolutely, in addition to their salaries, the fees and commissions they collect, as making up their compensation, irrespective of whether the total produced be $6,000, or ten times that amount. The latter clause of the section thus manifesting plainly the purpose of congress to give to deputy collectors their salaries, together with all fees and commissions, the same expressions, used simultaneously in defining the compensation of the collector, must carry the same signification, unless restrained or extended by other language in the act. U. S. v. Freeman, 3 How. [44 U. S.] 556.

This construction deduced from the natural force of the enactment, may be considered as being corroborated by the particulars contained in the case, showing the facts and circumstances which led to and surrounded the passage of the act. Documents were laid before congress showing the exorbitant expenses to which the officers in charge of the revenue service in California would be subjected, and the necessity of immediate legislation extending the revenue laws to that territory. Executive Documents, 30th Cong. 2d Sess. Ineffectual efforts had been made by congress to organize the territory, and, at the close of the session, the act in question was pressed to its passage at the last hour of that congress, as being of urgent emergency, and was framed in general terms, to avoid the hazard of specific enactments and amendments. House Journal, 30th Cong. 2d Sess. p. 514; Senate Journal, 30th Cong. 2d Sess. p. 338; Congressional Globe, 30th Cong. 2d Sess. pp. 691, 692. The act was adopted only as a provisional measure, to be displaced at the next session by one adapted to the state of the country and its commercial business. No evidence was furnished at the time showing the extent of income to be expected from that collection district, or that all the fees and commissions received by the collector would afford him an unreasonable compensation; and it is fair presumption that congress intended, in leaving the collector to the chance of receiving no more than $1,500 a year, to give him the advantage of the contingency of the whole

emolument of fees and commissions which might be collected.

This presumption is justified by contemporaneous, antecedent, and subsequent enactments on the same subject matter, in which congress has cautiously avoided, by positive provisions, leaving the subject of compensation open to hypothetical augmentations or diminutions. In acts approved the same day with the one in question, congress excludes, by explicit language, all implication on the subject of compensation, and signifies its design to make the limitation in plain words, when one is to accompany the grant of pay. In the second section of the "Act to establish the collection district of Brazos de Santiago, and for other purposes," approved March 3, 1849 (9 Stat. 409), it is provided, that the collector shall be entitled to a salary not exceeding $1,750 per annum, including in that sum the fees allowed by law, and that the amount he shall collect in any one year for fees exceeding the sum of $1,750, shall be accounted for and paid into the treasury of the United States. And, in relation to the deputy collector, it is provided, by the sixth section of the same act (9 Stat. 410), "that the compensation of the said deputy collector shall be the usual fees of office, and nothing more." So, in the second section of the act declaring Fort Covington in the state of New York a port of delivery, and authorizing the appointment of a deputy collector to reside at Chesapeake City in the state of Maryland, approved March 3, 1849 (9 Stat. 414), it is provided, "that the compensation of the said deputy collector shall be the usual fees of office, and nothing more." The omission of those qualifications in the California act becomes more significant, in connection with the fact that two of the last-cited enactments were passed in the senate on the same day with the act in question, and the other one on the day preceding. Senate Journal, 30th Cong. 2d Sess. pp. 297, 305, 315, 327.

The presumption referred to is forcibly strengthened by the third section of the act of September 28, 1850 (9 Stat. 509), which makes applicable to the collection districts in California the provisions of law in relation to the payment of expenses incidental to the collection of the revenue from customs, existing prior to the act of March 3, 1849 (Id. 398), entitled "An act requiring all moneys receivable from customs and from all other sources, to be paid immediately into the treasury, without abatement or reduction, and for other purposes." This manifestly imports, that congress did not consider the mere extension of the revenue laws to California as carrying with it the restrictions or directions of the prior act of March 3, 1849; for, it would be supererogatory and tautological to re-enact a provision already in force. And, that such was the judgment of congress, is also inferable from the fact, that the act of September 28, 1850, does not renew the extension of the revenue laws to the state, but they are treated as in force there by virtue of the act of 1849 making that extension.

So, also, in acts passed prior to 1849, it seems to have been assumed, that an appointment of salary or fees, or of the two together, to revenue officers, would operate without limitation of amount, unless restricted by the express language of the enactment, notwithstanding the existing acts of 1822 and 1841; and, accordingly, congress, in repeated instances, declared such limitation in positive terms.

The second section of the act to establish a port of entry at Saluria and for other purposes, approved March 3, 1847 (9 Stat. 182), gives to the collector of Saluria a salary not exceeding $1,250, including in that sum the fees allowed by law, and requires the excess collected above that sum to be accounted for and paid into the treasury. The third section appoints specific salaries to several surveyors; and, to the deputy collector at Aransas, the legal fees on the business he may transact, and no more. The fifth section gives to the collector at Galveston a salary not exceeding $1,750, including in that sum the fees allowed by law, and directs the amount of fees collected exceeding that sum to be paid into the treasury.

This series of legislative acts appears to us to be a plain recognition by congress of the principle, that every appointment of compensation to revenue officers will have effect according to the terms of the enactment; and that limitations or restrictions as to amount are not to be presumed, but, on the contrary, to take effect, must be expressed in direct terms, or be connected with the grant by necessary implication.

We think, also, that the act subsequently passed, creating additional collection districts in California, approved September 28, 1850 (9 Stat. 508), rests upon the assumption that, to restrain the right of the collector of that district to retain all the fees and commissions collected by him, there must be a different disposition of those emoluments by positive law. The second section gives to the collector and other officers resident at San Francisco, salaries not exceeding a specified sum; and to the other collectors in the state definite salaries, with an additional maximum compensation of $2,000 each, should their official emoluments and fees provided by existing laws amount to that sum. The sixth section gives the collector of Mackinac a salary, together with such commissions and fees as are authorized by existing laws. The eighth section provides a salary to the collector of Minnesota, with the declaration, that he shall not receive any other compensation whatever, in the shape of extra allowance or fees of any description whatever.

So, also, the provisions of the act to create additional collection districts in the territory of Oregon, approved February 14, 1851 (9 Stat. 566), are drawn up in view of the same

import of a general grant of fees. The second section grants to various collectors $1,000 each per annum, with an additional maximum compensation of $2,000 each per annum, should their emoluments and fees provided by existing laws amount to that sum; and allows to various surveyors, in addition to the fees authorized by existing laws, a compensation of $1,000 each per annum. The third section directs the appointment of several surveyors, whose compensations, in addition to the fees authorized by existing laws, shall not exceed $1,000 each per annum.

This course of enactments at periods before and after and concurrently with the act in question, denotes, in our judgment, that congress contemplated that a grant of fees, emoluments or commissions in positive terms, was free from the limitations and restrictions of the acts of 1822 and 1841, unless brought within those qualifications by other plain provisions in the law. We also think that the joint resolution of congress adopted February 14, 1850 (9 Stat. 560), if it has a bearing upon this case, is declaratory of the understanding of congress that the act of March 3, 1849, would be executed in that sense at the treasury.

The act of March 3, 1849, being the last statute applicable to the case of the defendant, we consider it to be the expression of the legislative will as to the amount and mode of the defendant's compensation in that service, and are of opinion that it is to be carried into effect conformably with its terms.

It is insisted, for the plaintiffs, that that act was superseded by the act of September 28, 1850, and that the defendant can claim for his services thereafter, until the time he was displaced in 1851, no compensation that is not authorized by the last-mentioned statute. The position is not taken, in terms, that the prior act is abrogated by the later one, but such is the legal import of the objection; and, no doubt, on general principles, the last enactment goes into immediate operation, and thus annuls and repeals all preceding ones inconsistent with it. Matthews v. Zane, 7 Wheat. [20 U. S.] 164; 1 Kent. Comm. (7th Ed.) 455.

It might, perhaps, be an open question, as respects third persons, whether the defendant could perform any official acts after the passage of the last-mentioned act, or maintain a claim at law for his compensation. But we do not think that the plaintiffs in this action can avail themselves of that objection; and we are not called upon to consider what effect that act may have upon the rights of other parties than the United States, in their claims upon or dealings with the defendant. The plaintiffs, in adjusting his accounts at the treasury, and also in this action, proceed upon the assumption that he was clothed with the authority and responsibility of collector in respect to the government, so long as he continued to act in that capacity,

without notice that his authority was rescinded. In exacting from him, up to that period, the services and responsibilities of collector, under the law authorizing his appointment. the plaintiffs must be held chargeable to him for all the rights and recompenses secured to him by that law, until he became apprised that his powers had ceased. The plaintiffs, by adopting the acts of the defendant between September 28, 1850, and January 14, 1851, as official and as within his legal competency, have sanctioned them, and rendered them valid, in so far as the claims arising therefrom in favor of the defendant and against the United States are concerned. In that point of view, it may probably be deemed, that the first organization of the collection districts in California, and the appointment of the defendant as collector, remained in force until the act of September 28, 1850, was put into execution. The act of March 3, 1849, extended the revenue laws of the United States over the territory of Upper California. The object and effect of that law have not been abrogated or suspended by express legislation; and it is not to be presumed that an interregnum in the administration of it was contemplated by congress in the enactment of the act of 1850—otherwise, there must have been a period in which no law for the imposition and collection of duties in that territory or state existed. The reasonable intendment would probably be, that the existing law was to remain in force until the new system or authority was put into operation in its place; and, in our opinion, the case of Cross v. Harrison, 16 How. [57 U. S.] 164, recognizes and applies a like principle to facts essentially analogous to that feature of the present case. But, whether this be so or not, we think that, in a transaction between the government and the collector, touching the adjustment of his accounts, the plaintiffs, by continuing an account with him as an officer duly acting under the law of 1849, have ratified those acts, and are concluded from denying his claim for a proper compensation therefor; and that the provisions of that act, being the one under which his services were rendered, afford a certain and appropriate measure of that compensation.

It is to be observed that the act of September 28, 1850, makes no different provision for the compensation of services rendered under the act of March 3, 1849, and cannot, accordingly, be construed as withdrawing the former provision, and substituting a new one for the compensation of those services. If it be apposite to the subject, it takes away all allowances in that respect, for it transmutes the single collection district created by the act of 1849 into six districts, each having all the officers and authority of an independent collection district, to each collector in which is appointed a specific compensation. There is no language in the act of 1850 indicating that any one of those allowances affords a

rule for determining the pay to which the defendant would be entitled for performing duties over the entire state; and, if the provisions of that act were in any way applicable to this case, the reason of the thing would seem to require that the whole amount allotted to the six collectors for the same territory over which the authority of the defendant was exercised, should be allowed to him, rather than either of the separate sums designated. We do not, however, propose to discuss this point, because we place our decision on one of a broader bearing, and which renders this special topic unimportant.

The defendant was placed in charge of an important service, in a remote section of the Union, and where notice of the cessation of his office was not and probably could not be made known to him before January 14, 1851. A public necessity accordingly existed for the continuance of his functions up to that period. In performing those duties, he received and disbursed moneys, and charged and credited them to the plaintiffs, in the capacity of collector. The treasury continued its accounts with him in that character. It not only debited him, as collector, with receipts, and credited him officially with payments, until January 14, 1851, but it carried forward the accountings in that character until September 22, 1853. when the final balance was struck against him for his official indebtment. This action is prosecuted to recover from him moneys collected officially and retained by him to cover credits which he claims in his character of collector; and the plaintiffs, under the facts, might be held, after so dealing with him, to be concluded from denying that he was collector de facto and de jure, under the act of 1849, until the time when his office was transferred to a new officer, on the 14 of January, 1851, and that he is entitled to compensation until that period conformably to the provisions of the act of March 3, 1849. The plaintiffs establish no legal title to the moneys demanded, except in subserviency to that principle. The treasury transcript would be nugatory as to all doings of the defendant out of office, and could afford no foundation for the recovery of a debt incurred by him after the passage of the act of September 28, 1850. The full rights of either party cannot be adjusted in this action on any footing other than the assumption that the act of 1849 virtually governed the entire transactions until that of 1850 was put in actual operation.

We think, accordingly, that the defendant is entitled, on legal considerations, to retain from the various moneys in his hands as collector, the full compensation granted to him by the act of 1849. And it matters not, to the just determination of this cause, whether the decision be placed upon the ground that that act remained in force to this end, as between these parties, or whether a proportionate part of the salary of $1,500, together with the fees and commissions which accrued between September 28, 1850, and January 14, 1851, be adopted as measuring the quantum meruit of his services. We accordingly decide, that the defendant is entitled to be credited, on his accounting with the treasury department, with his salary at the rate of $1,500 per annum, and with the fees and commissions allowed by law, during the whole period in which he continued to perform the duties of collector in California; and we direct the special verdict to be entered accordingly.

We proceed to dispose of the questions of law arising under the following finding of the special verdict: "And the jury further find, that the said James Collier, as such collector as aforesaid, during his said official term of service, seized. as forfeited to the United States, certain liquors imported into the district of Upper California contrary to the revenue laws of the United States under such circumstances; and that, unless the want of a judicial proceeding to ascertain and enforce such forfeiture, or the circumstances herein or in the case to be stated, shall be deemed an impediment to such right. he, the said James Collier, by virtue of the ninety-first section of the act to regulate the collection of duties on imports and tonnage, of 1799, would be entitled, as such collector, to one moiety of the said forfeitures. The jury further find, that it being impracticable. without an expenditure which would have consumed the whole value thereof in costs, to institute any regular judicial proceedings touching such forfeitures, the said James Collier caused the said seized liquors to be sold; that the proceeds of such sales were ninety-four thousand seven hundred and four dollars and sixty-six cents; that the costs and expenses of storing, preserving, and selling said liquors, amounting to twenty-four thousand eight hundred and seventy-three dollars and eighty cents; and that the nett proceeds of said forfeited goods, which came to the hands of said James Collier, amounted to sixty-nine thousand eight hundred and thirty dollars and eighty-six cents, of which the said James Collier claims the one half, being the said sum of thirty-four thousand nine hundred and fifteen dollars and forty-three cents. And, whether the said James Collier is accountable to the United States for all or any part of the proceeds of said liquors, or whether he is entitled to a credit, as collector, for the one moiety or half part thereof. being the last-mentioned sum. is submitted to the court. In each of such seizures, the said James Collier obtained from some owner, or from the carrier. master, or consignee, or other most accessible person. acting as agent for the owner in the importation of said liquors, or having the charge and custody thereof for the owner, a certificate, consent, or abandonment, similar in character to the certificates of abandonment which are inserted in the case as having been given in evidence on the trial.

He gave credit to the United States, in his periodical official returns to the treasury, for the gross sums so received on such sales, charged the said costs and expenses, and returned the appropriate vouchers to the treasury department, which returns were received without objection by the treasury department, from time to time, during his entire official term; and he claims to be entitled to retain to his own use a moiety of the said nett proceeds. After the commencement of this suit, the secretary of the treasury, assuming to act under the first branch of the fourth section of the act first above in this finding referred to, received applications on behalf of persons claiming to be owners of the said seized liquors, for remission of the said forfeitures, and made allowances to them, not as and for the proceeds of said sales, but as and for the cost or value of such liquors before their importation. A schedule of such allowances, with a statement of the amounts awarded or allowed as aforesaid, and of the amount paid out of the treasury of the United States under such allowances, and of the amounts remaining to be paid on demand and exhibition of power to receive the same, was given in evidence. is to be inserted in the case, and is to be deemed a part of this verdict."

We do not enter into the question whether, in the condition of things and under the exigencies stated in the special verdict at the time those. moneys were received and paid into the treasury by the defendant, his proceedings constituted a legal forfeiture and disposal of the liquors seized and sold, or of their proceeds, as against the lawful owners. The precise question presented by the special verdict legitimately extends only to the inquiry, whether the United States have a right or title to the moiety thereof retained by the defendant, which enables them to collect from him or control that moiety. The special verdict presents considerations sufficiently direct and weighty to show that the official conduct of the defendant in the course taken by him in respect to those liquors, was based upon intentions to subserve the rights and interests both of the United States and of the owners of the property, and to exonerate him from all charge of a wanton misapplication of his powers and authority; and it shows, moreover, that the treasury adopted and ratified, so far as it was competent for that department to do so, the acts of the defendant in that behalf. In this posture of the case, it is not easy to produce any rule of law or equity which will enable the plaintiffs to disavow, at an after period, their approval of those acts, and hold the defendant responsible to them for the entire avails of the property. Nor are we satisfied that the United States acquired such title to the moiety retained by the defendant, as to enable them to maintain an action for its recovery against him.

We have put the decision of this point on the facts before us showing that the owners of the liquors seized, or their agents, assented to the sales by the defendant without the intervention of any court of law, and have never withdrawn or repudiated such assent, and that the treasury department, with full notice that no recourse had been had to the courts of the United States in Oregon or Louisiana, to obtain condemnation and sale of the property, received, to the use of the United States, the one-half of the proceeds of such sales, and entered the usual credits, in the accounts of the defendant, for such amount.

The proceeding by the secretary of the treasury to restore those proceeds to the owners of the liquors, after this suit was commenced, could not divest the right and title of the defendant to the one moiety which had been for a long period in his actual possession. and was received, as between him and the plaintiffs. in a manner tantamount to that of a formal distribution of the proceeds after condemnation by order of court. The authority of the secretary of the treasury to remit forfeitures under the revenue laws, has been determined to embrace also the interests of the officers entitled to share in the forfeitures; and such authority to remit may be exercised after judgment of condemnation. U. S. v. Morris. 10 Wheat. [23 U. S. 246; Id., [Case No. 15,816]. But the power ceases after the share of the forfeiture is received by the collector for distribution among his co-officers. Id. As the collector, in this instance, acted without the co-operation of a naval officer or surveyor. the entire moiety received by him was his legal share of the forfeiture. and is in his hands, with the same right on his part to the whole of it, that he would have possessed to his aliquot part of it, if it had been required by law to be divided between him and other officers. In our opinion. therefore, if the award of these moneys by the secretary of the treasury to the owners of the liquors seized. had been strictly in the form of a remission. under the authority of the first section of the act of March 3, 1797 (1 Stat. 506), it would be inoperative and void as to the defendant. after the moneys had public-ly gone into his hands. and were held as his own property. The Hollen [Case No. 6,608].

The same principles would apply if the secretary of the treasury had acted under the fourth section of the act of September 28, 1850, and had directed the technical remission of the forfeitures; and this without respect to any question as to whether, the seizure and confiscation having been anterior to the passage of that act, it was not necessary, under the proviso to that section, to show the seizure to have been improper on the part of the collector.

Nor does it seem to us that a mere order of restoration of the proceeds of those forfeitures to the former owners. at the discretion

of the secretary, without the concurrence of the defendant, or notice to him that such an order was applied for or was intended to be made, can be regarded as a remission, within the provisions either of the act of March 3, 1797, or of that of September 28, 1850.

We are of opinion, accordingly, that the defendant is entitled to retain the sum of $34,915.43, being the moiety of such proceeds, and to receive credit for the same in his accounts.

The claim of the defendant to a credit of $12,300, being the one-half of the amount of bonds received by him for certain vessels and goods seized as forfeited, was disallowed by the treasury department. The special verdict as to that claim finds, "that the sum purporting to be secured by three certain bonds to the United States, set forth with the evidence in this case, taken by the said James Collier for seized vessels or goods delivered up, and which are in evidence, being the vessels or the cargoes of the Ocean, Callooney, and Lallah, was twenty-four thousand six hundred dollars; that the said bonds were returned by him, said James Collier, on leaving office, into the treasury department of the United States, and have not been collected, nor have any proceedings been had or attempted by the treasury department for the purpose of collecting the same; and they further find, that if the said last-mentioned sum had been collected and received, the said James Collier would have been entitled to the sum of twelve thousand three hundred dollars, being the one-half part of the amount of the said bonds; and the said James Collier claims a credit for that amount in his accounts, the same having been disallowed."

In our opinion, the defendant is not entitled to have those bonds regarded as money actually paid into the treasury. They were not accepted by the treasury in satisfaction of the value of the property forfeited, so as to raise an equitable credit, on that footing, in favor of the defendant. He received the bonds and transmitted them to the treasury department, to be dealt with there under their authority and not under his; and, even a laches by the government, if one may be imputed to it, in not enforcing the bonds, would not authorize him to treat those securities as so much money received by the treasury. He gives no evidence that the obligors are or were responsible sureties for the amount, nor that he demanded any action on the part of the government to enforce payment of the bonds. No higher right to the value of the bonds can be claimed by the defendant, than he would have possessed to the vessels or merchandise which they represent, had such property been detained, by order of the treasury department, under arrest and without adjudication; and it is plain that the collector's right to a share in seized property applies only to the proceeds obtained from its condemnation and sale, and in no way attaches to the property itself. There is no evidence before the court authorizing it to act upon those securities as money proceeds of the seized property. We are, therefore, of opinion, upon the finding of the jury, that this claim was properly disallowed by the department.

The special verdict finds, "that of the moneys so received by the said James Collier, twenty-eight thousand dollars was received for the additional duties of twenty per centum ad valorem, prescribed to be levied, collected and paid, by the eighth section of the act reducing the duty on imports and for other purposes, passed July 30, 1846, one-half of which sum the said James Collier claims as a credit in his accounts, the same having been disallowed." We consider the case of Ring v. Maxwell, 17 How. [58 U. S.] 147, as determining that the sum so demanded by the defendant did not accrue from fines or penalties, but was composed of duties chargeable by law on the merchandise imported. Accordingly, the defendant has no legal claim to that sum.

The special verdict finds, that "the said James Collier, in rendering his said periodical accounts, charged himself, as a part of a larger amount, with the sum of eight thousand one hundred and ten dollars and twenty-nine cents, received to the use of the United States by the deputy collector at Monterey, which forms a part of the debits so claimed against him by the United States in the several stated accounts. The said sum was stolen from the said deputy collector without neglect or default on his part, or on the part of the said James Collier, and the said James Collier, in the same account in which he returned the said last-mentioned sum as a charge against himself, claimed a credit per contra, against the United States, for the last-named sum thus stolen."

The deputy collector at Monterey was not made subject to the removal or control of the collector of the district. The collector had no other connection with his appointment than that of proposing him to the secretary of the treasury for his approbation; and the fourth section of the act of March 3, 1849, secures to the deputy a compensation independent of the collector, and gives to him, in his section of the district, the same standing, in respect to fees and commissions, as the collector had at San Francisco. This would rather render the deputy collectors in California agents of the government than of the collector personally. Whether this be so or not, the legal relation between public officers and their sworn assistants, even when they are acting directly in connection, is generally not that of master and servant, or principal and agent; and the liability of the official superior for defaults of his assistants arises only in case of his own misconduct or neglect. Dunlop v. Munroe, 7 Cranch [11 U. S.] 242; Story Ag. §§ 321, 322; Bailey v. Mayor, etc., of New York, 3 Hill, 531; Wiggins v. Hathaway, 6 Barb. 632.

Even if the defendant stands in law responsible for the conduct and liabilities of the dep-

uty at Monterey, and is to be regarded as the holder, for the benefit of the United States, of the funds purloined, still, it being found, by the verdict of the jury, that the money was stolen, the defendant, upon well-established principles of equity law, would be exonerated from all liability for them. Spence, Eq. Jur. 437, and cases there cited.

In an action by the United States against a disbursing officer or agent or other individual, for the recovery of moneys claimed of him, the defendant is entitled, on the trial, to the allowance of all equitable demands of his against the United States, if the same have been submitted to the proper accounting officers of the government and disallowed by them. Act March 3, 1797 (1 Stat. 515, § 4); U. S. v. Wilkins, 6 Wheat. [19 U. S.] 135; U. S. v. Jones, 8 Pet. [33 U. S.] 375; U. S. v. Robeson, 9 Pet. [34 U. S.] 319; U. S. v. Hawkins, 10 Pet. [35 U. S.] 125.

On the finding of the jury, the charge in question must be rejected from the account against the defendant.

On a careful consideration of the whole case we shall order judgment to be entered therein to the following purport:

1. The defendant is entitled, under the fourth section of the act of March 3, 1849, to a credit, as compensation for his services as collector, to $1,500 per annum, and the fees and commissions allowed by law, without limitation or restriction, from the date of his appointment under the said act, and during the continuance of his services as such collector, down to the 14th of January, 1851, when he surrendered the custom-house to T. Butler King, who then appeared and took possession of the same, and entered upon the discharge of the duties of his office as collector under the act of September 28th, 1850, which organized the territory of California into six collection districts, and provided for the appointment of a collector in each district.

2. The defendant is not entitled to a credit for a moiety of the $28,000 received as additional duties of 20 per cent. ad valorem, under the eighth section of the tariff act of July 30, 1846.

3. The defendant is not entitled to a credit for a moiety of the $24,600 secured by bonds given upon the release of vessels seized for a violation of the revenue laws.

4. The defendant is not liable for the $8,110.29 charged against him, which was received by the deputy collector at Monterey, and which was stolen from him without default on his part or that of the collector.

5. The question of interest is reserved until the account is stated between the government and the defendant conformably to the principles here settled.

Subsequently, the case was submitted to the court upon the reserved question of interest, and upon an agreed exhibit of the counsel for the respective parties, showing that, upon the accounts stated conformably to the decision of the court upon the merits, there was a balance due to the defendant of the sum of $8,110.29, being the sum of money allowed to him by the special verdict as having been stolen from the deputy collector at Monterey; and the counsel were heard upon the question, whether either party was entitled to an allowance of interest upon any and which particulars of the account.

Before NELSON, Circuit Justice, and BETTS, District Judge.

BETTS, District Judge. We are of opinion that no interest be allowed to either party, and that a balance of $8,110.29, as due to the defendant, be certified in favor of the defendant against the United States, according to the terms of the special verdict.

In the argument before the court in support of the claim to interest, the counsel for the United States conceded that, according to the principles laid down in the opinion of the court on the case at large, the defendant had overpaid the government, unless he was chargeable with interest. The proposition maintained for the plaintiffs is, that the account should, under the decision of the court, be stated as follows:

| | | |
|---|---|---|
| Balance, as computed without interest, in the account made up on the 7th of March, 1853 | | $216,712 43 |
| Deduct, by order of the court: | | |
| One-half of nett proceeds of seized liquors | $34,915 43 | |
| Commissions | 63,250 95 | |
| Money stolen at Monterey | 8,110 29 | |
| | | 106,276 67 |
| | | $110,435 76 |
| Interest on this sum from January 14, 1851, to 16th September, 1853, at 6 per cent | | 17,721 88 |
| | | $128,157 64 |
| Deduct payment, 16th September, 1853 | | 118,546 05 |
| Balance | | $9,611 59 |

It is admitted that, applying the payment of $118,546.05 to the account, the debit side, independent of interest, is satisfied, with a balance over in favor of the defendant; but it is contended that the balance of interest remaining unpaid forms, from the time of such payment, a new capital, on which interest should be computed to the time of the judgment. On that hypothesis, the plaintiffs claim to be entitled to judgment for $9,611.59.

The jury find "that five several statements of the defendant's account were made up by the treasury department, and that the balance stated as due from the defendant to the United States in each of said five accounts was not due, a less amount, if any thing, being in fact due, and that none of the said accounts, except the last, contained any claim for interest, and, in the last of said accounts, interest was claimed, as therein stated." The last statement there referred to was made up September 22, 1853. This action was commen-

ced in May, 1852, upon the indebtedness charged in the account stated June 7, 1851.

It is at best questionable whether the comptroller had any authority to restate and augment the debit side of the account, at any time after the first statement had been adopted and repeated in the subsequent treasury statements of September and December, 1851, and March, 1853. Ex parte Randolph [Case No. 11,558]; U. S. v. Kuhn [Id. 15,545]. More particularly would the right of accounting officers to change the treasury statement, by adding a claim of interest, after a payment had been received from the defendant which overpaid the principal really due upon the account as it stood when the payment was made, be open to exception; for, it is the addition of interest to the demand after the 16th of September, 1853, when the defendant paid into the treasury $118,546.05, which produces the balance of $9,611.59, claimed to be due on the statement of September 22, 1853. The technical objection to varying the account is, that it creates a new cause of action after suit brought; but, one more vital to it on the merits is, that the treasury department acts in a judicial capacity in determining the charges to which the defendant is subject, and is not competent to vary that adjudication subsequently, to his prejudice. The decision of the department, within the rules prescribed for the exercise of its powers, is, in effect, final. U. S. v. Jones, 8 Pet. [33 U. S.] 375. We think, therefore, that the plaintiffs are not entitled to set up a charge of interest made in the restatement of the defendant's account on the 22d of September, 1853, and to renew that charge in this action.

But, if this objection is disregarded, and the right to interest is placed upon the footing that the defendant is liable, under the direct provisions of the first section of the act of March 3d, 1797 (1 Stat. 512), for the settlement of accounts between the United States and receivers of public money—or on the general principle of law, that a running account is to be deemed liquidated, so as to form a basis of liability for interest, from the time of its adjustment and statement at the treasury —or on the ground that a trustee is chargeable with interest on all sums in his hands, from the time they are received until they are paid over or applied to the use of the cestui que trust—the plaintiffs, in our opinion, fail to bring this case within the purview of either of those principles.

The statute subjects a receiver of public money to the payment of interest thereon, if he "shall neglect or refuse to pay into the treasury the sum or balance reported to be due to the United States upon the adjustment of his account." Act March 3, 1797, § 1 (1 Stat. 512). The imposition of interest is made by the statute dependent on the refusal of the delinquent to pay into the treasury the sum or balance reported to be due. Upon the finding of the jury by their special verdict, the sum or balance reported to be due in the five

different adjustments and statements of the defendant's account, was, in no instance, due; and this verdict relieves the defendant from the obligation to pay into the treasury either sum or balance reported to be due by him. It would be oppressive to exact a deposit of $791,065.31 in the treasury by the defendant, at the risk of his being subjected to the payment of interest upon any balance which might chance to be reserved out of a vastly surcharged account, during the indefinite period in which the subject might be kept in litigation.

There is strong reason for understanding the provisions of the act as being directed against wilful defaulters, whose delinquency is made clear. Interest in the nature of a penal infliction may then be carried into the account and enforced against them. This is not the position in which the defendant is placed by the proofs. There was no delinquency on his part in bringing his accounts to an adjustment. The evidence is full to show that his accounts and vouchers were promptly transmitted by him to the treasury department, and that the department was beset by himself personally, by his agents, and by correspondence, from the date of his return from California, with importunate urgency, to bring his accounts to an adjustment. The impediment to the completion of the accountings was in no respect with him. The fluctuations of balances in the successive statements, descending and ascending, between $791,065.31 and $181,797, and finally resting at $216,712.43, upon which he paid into the treasury $8,110.29 more than is found to be due to the United States, resulted from the varying views, among the accounting officers, of the proofs, which, from the beginning, had been one and the same before them. We do not wish to be understood as saying that, if the suit had been brought upon the statement of March 7, 1853, a jury might not, in passing upon the rights of parties embraced in a complicated and indeterminate state of accounts, have awarded interest on the sum paid in September, 1853, and which was found sufficient to extinguish the debt. But, in our judgment, the treasury statement so made up, is not to be accepted as a liquidated adjustment, fixing an indebtedness upon the defendant, and stands in law, when in contestation, and found to be grossly erroneous, no more privileged to claim interest, than running demands between parties, consisting of moneys advanced on one side and disbursements and services upon the other. We consider the accounts as open and running, in effect, until the plaintiffs and the defendant accepted the one of the 7th of March, 1853, made up during the pendency of the action, as that upon which the rights of the parties were to be determined. This charge was fully satisfied and extinguished by payment, and, had it included a charge of interest, we should have considered the plaintiffs entitled to interest, from the time the balance was ascertained, until its discharge. As that

account contained no such charge, and no un-dertaking of the defendant to pay interest is proved, we place the demand on the same ground of an unliquidated account, which it previously held.

To have our conclusions distinctly appre-hended, it is proper to observe, that the plain-tiffs gave in evidence, in support of their ac-tion, no other adjusted statement of the de-fendant's accounts than the one first made up, that of June 7th, 1851, and that the subse-quent statements were given in evidence by the defendant.

This case was taken to the supreme court by writ of error, and the judgment of the circuit court was affirmed by a divided court. For that reason, the case does not appear in the Reports of the Supreme Court.