## In re SOUTHERN PAC. CO.

(Circuit Court, N. D. California. August 16, 1897.)

### Nos. 12,247, 12,248.

CUSTOMS DUTIES—CLASSIFICATION—LIQUID CREOSOTE.
    The liquid creosote of commerce is not a "distilled oil," within the meaning of paragraph 60 of the tariff act of August 27, 1894 (28 Stat. 509, 511), but is a "product of coal tar," within the meaning of paragraph 443 of said act, and entitled to free entry, not being otherwise specially provided for in the act.

Applications by the Southern Pacific Company for a review, under section 15 of the customs administrative act (Act June 10, 1890; 26 Stat. 131), of the decision of the board of United States general appraisers relative to the classification for duty of two importations of creosote merchandise. Both petitions were heard together.

John J. De Haven and F. B. Lake, for petitioner.

H. S. Foote, U. S. Atty., and Samuel Knight, Asst. U. S. Atty.

MORROW, Circuit Judge. These are two applications by the Southern Pacific Company for a review by this court, under section 15 of the customs administrative act (Act June 10, 1890; 26 Stat. 131), of the decision of the board of United States general appraisers relative to the classification for duty of two importations of creosote merchandise. Both petitions were argued together, and precisely the same testimony and the same questions apply to each. The merchandise in question was imported in casks, and is described in the invoices as "liquid creosote." It was imported from London, Great Britain, into the United States, at the port of San Francisco. The collector of the port at San Francisco classified this liquid creosote as a "distilled oil," dutiable at the rate of 25 per cent. ad valorem,

under the provisions of paragraph 60 of the tariff act of August 27, 1894, entitled "An act to reduce taxation, to provide revenue for the government, and for other purposes," and popularly known as the "Wilson Tariff Act." 28 Stat. 509, 511. The importer protested against the imposition of this duty, or any duty, on the ground that the creosote in question "is not a distilled oil, but is, at ordinary temperature, a solid, waxy crystal, the chief constituents of which are naphthaline, tar acids, and pitch, and as such should be admitted free of duty, under paragraph 443 of the act of August, 1894, as product of coal tar not specially provided for." Paragraph 60, under which the creosote was classified, provides:

"Products or preparations known as alkalies, alkaloids, distilled oils, essential oils, expressed oils, rendered oils, and all combinations of the foregoing, and all chemical compounds and salts, not specially provided for in this act, twenty-five per centum ad valorem."

Paragraph 443, one of the provisions placing articles on the free list, and under which, the importer contends, the creosote in question should be classified, provides:

"Coal tar, crude, and all preparations except medicinal coal tar preparations and products of coal tar, not colors or dyes, not specially provided for in this act."

The question to be determined is whether the creosote comprising these two importations is a "distilled oil," as found by the board of United States general appraisers, and therefore subject to a duty of 25 per cent. ad valorem, or whether it is a "product of coal tar," within the meaning of paragraph 443, and therefore entitled to free entry. The board of United States general appraisers overruled the protests of the importer, and found that the merchandise in question—

"Is a liquid substance, of a dark-brown color and tarry odor, of the specific gravity of 1.05028, and is known generally in commerce as 'dead oil' and 'creosote oil'; (2) that it is derived from coal tar by distillation, and is a distilled oil. Its chief constituents are naphthaline and its derivatives, along with the basic oils, parvoline, coridine, collidine, and leucoline, and bitumen dissolved therein, together with five per cent. of crude phenol of the carbolic and cresylic acid types."

While the board found that the merchandise comprising these two importations was known generally in commerce as "dead oil" and "creosote oil," it also found that it was derived from coal tar by distillation, and that it was a "distilled oil." Additional testimony was taken at San Francisco, upon an order of reference by the court. The evidence preponderates largely in favor of the proposition that the merchandise in question is known commercially as "creosote oil," or a "dead oil," and that it is the "product of coal tar" by fractional distillation. The testimony introduced on behalf of the government does not show satisfactorily that "creosote" is chemically or commercially, or even commonly, known and described as a "distilled oil." In Warren Chemical Manuf'g Co. v. U. S., 78 Fed. 810, this same question was before the court. In that case the board of United States general appraisers had classified certain coal-tar products as "products known as 'distilled oils,'" under paragraph 60. The importer

protested, claiming that it was simply a "product of coal tar, not a color or dye not specifically provided for," and therefore entitled to free entry under paragraph 443. It was held that inasmuch as it had not been shown that the article involved in that case was an oil in fact, or that it was chemically or commercially or commonly known as "distilled oil," the decision of the board should be reversed, and the article entitled to free entry under paragraph 443, as a "product of coal tar." While creosote may be termed an oil, still it is not known as a "distilled oil." It is true that the terms "distilled oils" and "products of coal tar," found, respectively, in paragraphs 60 and 443, are mere descriptive phrases. No question as to the commercial designation of the merchandise in question can arise, for what is known commercially as "creosote oil," or a "dead oil," is not specifically mentioned in either of these paragraphs, or in the act. The terms used seem to refer to the mode of manufacture, and it would appear that the board held the importations in question to be distilled oils because they were produced by distillation,—fractional distillation. But, while it is true that creosote is produced by distillatory processes, it is nevertheless also true that, according to the preponderance of the evidence, it is not known as a "distilled oil." That it is a "product of coal tar," there can be no doubt. Such being my view of the evidence, it will obviously be unnecessary to consider the other questions discussed by counsel. Even if I were in doubt as to which of these paragraphs applied, such doubt, under the rule of construction relating to tariff acts, would have to be resolved in favor of the importer. Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240; Twine Co. v. Worthington, 141 U. S. 468, 12 Sup. Ct. 55. It may be further observed that, in the tariff act of 1883 (22 Stat. p. 493), congress made a decided distinction between "dead oils," which term is applied to "creosote," and "distilled oils"; thereby indicating and recognizing a difference between the two classes of oils, and precluding the inference that the term "distilled oil" might include "creosote," or a "dead oil." The revenue or tariff laws of the United States are regarded as constituting practically one system. U. S. v. Collier, 3 Blatchf. 325, Fed. Cas. No. 14,833. It is a well-settled rule of statutory construction that expired or repealed acts in pari materia with the act to be construed may be considered by the court in seeking the correct meaning of words and terms employed in the enactment to be construed. 23 Am. & Eng. Enc. Law, 315, and cases there collated. See, also, Reiche v. Smythe, 13 Wall. 162. I am of opinion, therefore, that the creosote comprising the two importations under consideration is not a "distilled oil," within the meaning of paragraph 60, but that, on the contrary, it is a "product of coal tar," within the meaning of paragraph 443, and as such is entitled to free entry, not being otherwise specially provided for in the act.

It is further contended by counsel for the government that under the latter part of section 4 of the act under consideration, which provides that "if two or more rates of duty shall be applicable to any imported article it shall pay duty at the highest of such rates," the creosote in question must be subject to the duty of 25 per cent. ad valorem provided for in paragraph 60. It is assumed, of course,

that the merchandise in question is both a "distilled oil" and a "product of coal tar," and that, therefore, the duty provided for "distilled oil," being the higher duty, should apply. The contention is untenable. In the first place, I am unable, as stated, to find from the evidence that the creosote in question is a distilled oil within the meaning of paragraph 60. In the second place, I do not regard the provision applicable to this case, for the simple reason that it cannot be said, strictly speaking, that there are two rates of duty which can apply to the merchandise in question. If I am correct in holding that creosote is a product of coal tar, within the meaning of paragraph 443, it then is not subject to any duty whatever, but is entitled to free entry. Under this condition of affairs, if the creosote be subject to duty at all, there is obviously but one rate of duty which is applicable. As was aptly remarked by the court in Matheson & Co. v. U. S., 18 C. C. A. 144, 71 Fed. 394, 395, "as one [paragraph] imposes duty, and the other exempts from duty, it is obvious that congress did not intend both provisions to apply to the same article." Without discussing the questions any further, I am of opinion, both from the evidence and under the law, that the ruling of the board of United States general appraisers relating to the two importations involved in these two petitions was erroneous, and should be reversed, and it is so ordered.